EDWARD MOODY vs. WILLIAM C. HARPER.

Where property is sold under executions in favor of A., B., and C., and the proceeds applied to the satisfaction of the executions in favor of A. and B., to the exclusion of C.; or if the proceeds when applied *pro rata* would not satisfy all the executions: — *Held*, that this is sufficient to rebut the presumption of satisfaction of C.'s judgment, raised by virtue of the levy.

It is the settled law of this State, that the circuit court has no jurisdiction to quash a forthcoming bond after the return term to which it is returned forfeited, and an order quashing such bond is void.

This question has been repeatedly the subject of consideration under various states of facts by this court, and the rule invariably held, that the judgments

quashing such forthcoming bonds were void. *McComb* v. *Ellett*, 8 S. & M. 505, cited and confirmed.

FISHER, J., *dissent.* — The former decisions of the court on this point were not well considered; for whilst a party is allowed a day in court to move to quash a forthcoming bond, he is not restricted to any day during the term to which the bond is returned, or to that term of the court.

IN error from the circuit court of Hinds county; Hon. John J. Guion, judge.

This case was before the court at a former term, (25 Miss. 484,) where the facts will be found fully set forth.

A plea was filed by the appellee that the appellant had obtained an injunction, and had thereby released all errors, which was overruled by the court.

The jury found in favor of Harper, who was plaintiff in the court below; and Moody made a motion for a new trial which was overruled, and he then prayed a writ of error to this court.

*Freeman* and *Dixon*, for appellant.

This case was formerly before this court and was reversed and remanded. See 3 Cushm. R. 484. The plaintiff and defendant below both claimed the lots in dispute, by virtue of purchases at execution sales, under judgments against John Shields. Shields purchased the lots of the State of Mississippi, and obtained patents from the State for the lots on the 15th of June, 1838. Harper purchased the lots at sheriff's sale on the 20th of May, 1844, which sale was made to satisfy a judgment rendered on a forfeited forthcoming bond against Shields, bearing date the 16th of October, 1837.

Moody claims the lots by virtue of a purchase at sheriff's sale on the 13th of October, A. D. 1839, made to satisfy judgments against Shields, bearing date on the 17th, 18th, and 19th of April, A. D. 1838.

It will be observed that all of the judgments under which Harper and Moody purchased, were obtained before Shields acquired his title from the State, and although Harper's judgment was the oldest in date, yet it had no priority of lien, because the title to the lots was not in Shields until after the rendition of the judgments under which Moody purchased, so that the

Moody v. Harper.

lien of the judgments under which Moody purchased, was of equal dignity with that of Harper's. Moody, however, obtained an advantage by his superior diligence, and had the lots sub-jected to sale on the 13th of October, 1839, whereas the sale to Harper did not take place until the 20th of May, 1844, and Moody having been in constant possession of the lots since the date of his purchase, cannot be ejected by virtue of a purchase made five years after that of Moody.

But the court rejected the evidence of Moody's title, and allowed that of Harper to be read to the jury, and this calls for an investigation of Harper's title. We insist that Harper's title is insufficient to eject Moody for the following reasons: —

1. The judgment under which Harper purchased was satisfied by a levy on slaves, and sale made of the same on the 7th of May, 1838. This sale amounted to the sum of $2,530, and the sheriff returned that the same was held subject to an order of court. No order of court appears in the record appropriating the money to any other execution, and therefore the execution under which the sale was made, was satisfied. It is true, the sheriff refers to an order of court filed in one of the *fieri facias*, but there is no order of court to be found, and in the absence of an order of court, it was the duty of the sheriff to apply the money to the satisfaction of the judgment on which the execution emanated. Hutch. Code, art. 7, § 1, p. 447; Ib. art. 13, p. 450.

The statute authorizing the sheriff to examine judgment roll, and apply money to the oldest judgment, was not passed until 24th February, 1844. Hence the return of the sheriff that the money was appropriated to other executions, was false.

The memorandum of the clerk attached to execution, was not evidence of an order of court to that effect. Such an order could only appear on the minutes of the court. The admission of this memorandum in evidence was, therefore, erroneous.

2. It was proven that John Shields died in September, 1839, leaving a widow and one daughter. The sale was made to Harper without any revival of the judgment, and without notice to Moody or the heirs of Shields on the 19th of February, 1844, being five years after the death of Shields. *Erwin's Les-*

52*

*see* v. *Dundees*, 4 How. U. S. R. 78; 2 Wms. Saund. R. 51, n. 4; Bing. on Ex. 137; 16 Mass. R. 193; 1 Cowen, R. 711.

3. The court erred in permitting a pretended transcript of a patent from the State to John Shields to be read in evidence. There was no proof that the original was ever issued by the State. The heirs and representatives of Shields testify that they know nothing of its existence. There is no proof in the office of the secretary of State that such a patent ever existed. Patents issued by the State are not acknowledged by any one, and therefore cannot be recorded by the probate clerk; and if recorded, would be no evidence whatever of the existence of the original, nor any notice to anybody of the title conveyed thereby.

The fact that such a paper was recorded by the probate clerk proves nothing, because the act of recording was illegal. The testimony of the recording clerk is worth no more than that of any other person who may possess such a paper. Unless he can prove the issuance of the original by the State, his evidence can be of no avail. The admission of this transcript was, therefore, erroneous, and the recovery of the lot No. 2, described in that transcript, was also erroneous, as there was no other evidence of the title of Shields to that lot. The title remained in the State of Mississippi, who was not a party defendant.

4. There was no evidence that Jones, who was sued as tenant in possession, was in possession of either of the lots at the time he was served with notice. Upon reference to the bill of exceptions, it will be seen that the witness Tifft, who was introduced to prove the possession of Jones, contradicted himself, and was contradicted by several other witnesses.

5. The court erred in allowing plaintiff to read the affidavit of defendant Moody, in the pleading made by Moody under the statute to be admitted a defendant as landlord of the tenant in possession. This affidavit is required by statute to enable the real owner to defend, and is a legal formality in pleading which cannot be used as the admission of the fact that Jones was the tenant of Moody, in possession at the time of the commencement of the suit.

This affidavit was made long after the service of the notice

on Jones, as tenant in possession, and does not admit that Jones was in possession when the suit was commenced, nor at any other time. It is merely a formal statement of the style of the case made by the declaration to identify the pleadings, and does not admit any fact, except that Moody is the real owner of the land in dispute.

6. The court erred in ruling out the evidences of title offered by defendant Moody.

*Geo. L. Potter*, for appellee.

This was an action of ejectment, on the demise of Harper, against J. P. Jones, tenant in possession, for lots 1, 2, 7, and 8, in fractional square two north, in Jackson. Moody was admitted to defend as landlord, and plead the general issue, &c. Jones was duly served with notice, made default, and judgment was taken against him.

Plaintiff offered the record in case of *John Rains* v. *C. C. Mayson* and *Thomas Harney.* This shows a formal judgment rendered the 22d July, 1837, for $1,531.45 and costs; an execution thereon duly levied, and bond taken, with John Shields and Crafts as sureties, forfeited the 3d Monday of October, 1837; an execution on bond levied on slaves Jack, Jane, and two children, Emily and John, and two boys, Tom and Moses, as property of Mayson, which were sold to John Stubblefield for $2,530; and the return shows that the money was applied to other *fieri facias.* By order of court in this case, an *alias fieri facias* on the bond was issued the 12th January, 1844, and levied on the lots in controversy and other property, and all sold to plaintiff Harper, as the property of John Shields, for $265.

To show a due application of the proceeds of the slaves sold under the first *fieri facias* on the bond, plaintiff introduced the records, &c., in the cases referred to. The records show that the slaves levied on were sold under all the cases on same day.

Plaintiff then read the affidavit of Moody, on his application to be admitted to defend as landlord, which admits that Jones was tenant in possession.

Plaintiff then read the sheriff's deed for the lots in contro-

versy, made to him as purchaser under the Rains' judgment, which was duly acknowledged.

Plaintiff then read the original patents from the State to John Shields, for lots 1, 7, and 8.

To lay the foundation for the introduction of a copy of patent for lot 2, plaintiff then read to the court his own affidavit, showing diligent search for the original, and that same could not be found; also agreed statement that the widow and daughter of John Shields know nothing of said original, and that same could not, on due search, be found among his papers. The affidavit, &c., of Hampton probate clerk was admitted by consent, in lieu of the witness, with reservation of objections to competency, who proved that he recorded said original, and that said copy was correct; and that he had been unable, on search, to find the original. The court then permitted plaintiff to read in evidence said copy so proved by Hampton.

Plaintiff then proved by S. Tifft, that Jones was in possession of the lots in controversy at date of suit, 14th November, 1848.

Defendant proved by Miller, that Towns occupied the house on lots 7 and 8 in the fall of 1847, and part of 1848; that Wilkinson and Whitesides occupied house on lots 7 and 2, a part of 1848. Wilkinson proved that he so occupied till spring of 1848, when Whitesides lived there a short time, and believed Towns lived there till December, 1848. Whitesides thinks Towns lived there till late in 1848, but Jones lived there afterward in that year.

Defendant then offered to read three certain transcripts from Rankin circuit court, which, on objection by plaintiff, were excluded.

*Anthony V. Winans* v. *Stephen S. Shumack* and *Landy Lindsey*, which was a judgment the 17th April, 1838, for $65.49 and costs; bond forfeited, with John Shields and Stone securities, 3d Monday March, 1839, and execution on this judgment issued to the sheriff of Hinds county, and forthcoming bond was taken. That bond was for delivery of property at the court-house in Rankin, and was therefore void. The execution on

this bond, under which the lots were sold, was also void. It recited an original judgment for $90.61, instead of $65.49, and there is nothing to show where the judgment was recovered.

A bond with like recitals, and presenting the very point, both as to law and evidence, was held void in *Buckingham* v. *Bailey*, 4 S. & M. 538.

I can see no cause to reverse this judgment. The transcripts read by plaintiff, to show how proceeds of a previous sale under the Rains judgment were applied, were properly read for that purpose.

Proper ground was laid for the introduction of the copy of the patent for one of the lots. This was immaterial, as both parties claimed under Shields.

The affidavit of Moody was evidence to prove possession of the tenant. *Hamilton* v. *Shelton*, 1 Cushm. 499.

The transcripts offered for defendant were properly rejected. Two of them showed bonds quashed after return term, and *fieri facias* afterwards issued on original judgment. The other, *Winans* v. *Shumack et al.*, showed a sale under a void bond, — the bond having been taken by the sheriff of Hinds, and being for the delivery of property in Rankin.

The *fieri facias* on this bond was null. It was upon a judgment for a different sum, and did not show in what court it was rendered; there was nothing to connect it with the judgment set out in the transcript.

Moreover, plaintiff has released errors, by obtaining an injunction; transcript filed in proof of plea of waiver and release.

---

The injunction is not *per se* a release of errors in the proceeding at law; and this court can only receive as evidence to support a plea of release of errors, an actual release signed and sealed by the party making it, as required by the statute.

Mr. Justice FISHER delivered the opinion of the court on the plea filed by appellee.

The plea alleges that after the writ of error was issued, the plaintiff in error obtained upon a bill filed for that purpose an injunction against the execution of the judgment at law, and

this, it is insisted, operates *per se* as a release of any and all errors in such proceedings.

The statute declares that " No injunction shall be granted to stay an execution of a judgment at law, unless the party applying for such injunction, or to be benefited thereby, shall first sign and seal a release of errors in such judgment at law, and file the same in the office of the clerk of the court in which such judgment shall have been obtained." Hutch. Code, § 40, p. 760. This statute contemplates an actual release to be executed by the party enjoining the execution of the judgment at law. If in any case an injunction should be issued without such release, the chancellor may, upon the failure of the party to be benefited, to execute the release, dissolve the injunction; or if he has already prosecuted his writ of error, he may be put to his election by the chancellor, or on failure so to elect submit to a dissolution of the injunction and a dismissal of his bill.

Thus viewing the question, we are of opinion that the injunction is not *per se* a release of errors in the proceedings at law; that this court can only receive as evidence to support a plea of release of errors, an actual release, signed and sealed by the party, as required by the statute. The demurrer must, therefore, be sustained.

Mr. Justice HANDY delivered the opinion of the court.

The plaintiff and defendant in this case claim title to the land in controversy as purchasers at sheriffs' sales under executions against John Shields; and the merits of the case depend upon the question whether the judgment under which the one or the other purchased was the superior lien upon the land.

The plaintiff claims under a judgment or forthcoming bond forfeited at October term, 1837, and an execution sale at which be became the purchaser in May, 1844.

The defendant claims under three judgments rendered at April term, 1838, on one of which a forthcoming bond was forfeited in March, 1839; and on the two others, forthcoming bonds were forfeited in October, 1838, and so returned to the court then held. These two last forthcoming bonds were quashed at April term, 1839, on motion of the defendants in

the executions, and executions issued on the original judgments and upon the forthcoming bond forfeited in March, 1839; and under these three executions the defendant purchased in October, 1839.

It appears that John Shields, under whom both parties claim, acquired title to the land in June, 1838.

The first objection made in behalf of the plaintiff in error is, that the judgment under which the plaintiff claims was satisfied in law by the sale of property levied on under it.

It appears by the evidence that this execution, with three others, was levied upon the same property; and it is shown by the sheriff's return upon all these executions, that the proceeds of the sale of the property were applied to the satisfaction of the other executions to the exclusion of that under which the plaintiff claims. This is sufficient, in a case like this, to rebut the presumption of satisfaction of that judgment, especially as the plaintiff's lessor does not appear to have been in any way connected with the execution, or to have had any notice but that the facts stated in the sheriff's return were true.

But if it be taken that the proceeds of the sale must be regarded in law as applied to all the executions, the fund was not sufficient to satisfy all of them, and upon a *pro rata* application there was still a balance due upon the execution under which the plaintiff's lessor purchased, which to that extent would render it a valid execution. This objection is, therefore, untenable.

Secondly. It is insisted that the judgments under which the plaintiff in error purchased were liens upon the land of equal date with that under which the plaintiff claims; and inasmuch as John Shields did not acquire title to the land until after the rendition of all the judgments, that the liens all took effect at the same time upon his acquiring the title; that therefore the plaintiff in error as the first purchaser is entitled to the land.

But it appears that the original judgments under which the plaintiff in error claims, though rendered at April term, 1838, and before Shields acquired title, were bonded to October term, 1838, and the bonds forfeited, which extinguished the original judgments and operated as new judgments from October term,

1838. This was after the lien of the judgment under which the plaintiff claims had attached; and it is conceded that that judgment was the superior lien, but for the fact that these forthcoming bonds were quashed and the efficacy of the original judgments restored, and that the executions under which the plaintiff in error purchased, being issued upon the original judgments, were valid.

It appears that these forthcoming bonds were quashed after the return term and upon the motion of the defendants therein upon the ground that it did not appear by the sheriff's returns on the bonds that they had been forfeited. It, however, appeared by the sheriff's returns upon the executions that the bonds had been forfeited, and executions were issued thereupon accordingly, returnable to the next term after the forfeiture, at which term the motions to quash were made and sustained.

It is now the settled law of this State that the circuit court has no jurisdiction to quash a forthcoming bond after the return term to which it is returned forfeited, and that an order quashing such a bond is void. This question has been repeatedly the subject of consideration under various states of facts by this court, and by the rule invariably held, the judgment quashing the bonds in question was void, and the executions issued upon the original judgments were also void, the original judgments being extinguished by the judgments upon the forfeited bonds. *Mc Comb* v. *Ellett,* 8 S. & M. 505, and cases there cited.

Thirdly. It is objected that the court erred in admitting the testimony of Edwards to show that the patent from the State to John Shields for the lands had been entered on the records of the office of the probate clerk. This was offered as secondary evidence of the patent, the preliminary showing of its loss having been made; and we think the evidence was properly admitted. But it was altogether immaterial whether it was admitted or not, and cannot affect the decision of the case; for it was simply offered to show title in Shields, and as both parties claimed under him, it was unnecessary to adduce any such evidence.

Again. It is objected that there was no evidence that Jones was in possession of the premises when the action was brought, and that the affidavit of the plaintiff in error made in order to

Moody *v.* Harper.

be admitted as landlord to defend, was improperly admitted as evidence of the possession of Jones, the party sued as tenant in possession.

The declaration was in the usual form in ejectment with notice which was served on Jones, as tenant in possession. The affiant refers to the case, and prays to be admitted to defend instead of the tenant in possession. This must be considered as having reference to the party who was sued as tenant in possession, and as an admission that he was in possession. It is true, the affidavit was not made for the express purpose of making such an admission, but it necessarily had that effect, because it was an application to be admitted to defend in the place of the party who was sued as tenant in possession.

We are of opinion that there is no error in the judgment, and it is affirmed.

SMITH, C. J., concurs.

A petition for a reargument was filed by the appellant, but the court refused a reargument.

Mr. Justice FISHER delivered the following dissenting opinion:—

The merits of this case are made to depend by the opinion of the majority of the court, upon the question, whether an order of the court, quashing a forthcoming bond, at a term subsequent to that to which it should have been returned, must be treated, for all purposes, as void; and whether a sale of property, made under an execution, thereafter issued upon the original judgment, must also be treated as void, and the purchaser held to have acquired no title to such property.

The lots in question were sold by the sheriff of Hinds county in 1839, under certain executions issued on judgments of the circuit court of Rankin county, and were purchased by Moody, the plaintiff in error, but defendant in the court below. For the purpose of sustaining the deed executed by the sheriff, transcripts of the records of these judgments were introduced as evidence; and it appearing by the transcripts that forthcom-

ing bonds had been taken, returned forfeited, and quashed by the court at the term next succeeding the forfeiture, the transcripts were by the court ruled out as evidence; the court holding, that the order quashing the bonds was void, and being void, and the bonds still continuing in full force, no executions could issue upon the original judgments, and that Moody acquired no title in virtue of his purchase under the same.

The majority of the court sustaining the court below in this view of the law, I will proceed to state the reasons which have induced me to decline a concurrence in their opinion.

The majority treat both branches of the question as settled by the previous decisions of this court, namely, that the court after the return term of the bond, could not, under any circumstances or for any cause, entertain a motion to quash it; and second, that no execution could thereafter issue upon the original judgment, as it is called; or if issued, it would be simply a nullity, and all proceedings had under it consequently void.

If the majority are right in holding that the decisions have gone to this extent, the question then arises for consideration, whether the decisions are not so manifestly at war with sound principle, as to make it the imperative duty of this court to overrule them, or to disregard them as authority in deciding upon the matters involved in the present controversy. A court should never, for the mere love of consistency, persevere in what is known to be an error, and which must often in practice, do violence to the conscience of the court, as well as great injustice to private rights. The question in such case, is not one of consistency, but one of policy; and this depends upon the subject in regard to which the decision has been made, and whether the transactions of society have been so shaped or moulded with reference to the law so declared by the court, as to make a change of the rule inexpedient. But it cannot be contended that any such considerations present themselves on the present occasion. On the contrary, policy absolutely requires that the law on this subject, should be settled according to reason and correct principle.

The bonds in question were quashed in 1838 or 1839. It

was a common practice then, to quash bonds at any term of the court, and to issue executions on the judgment as pronounced by the court. This practice prevailed, perhaps, until as late as the year 1842, and property was sold from one end of the State to the other under such executions. If the decisions must stand as the settled law of the land, then it must follow that in every instance where property has been thus acquired, though it has been honestly and fairly purchased, and the money applied to the payment of debts which the debtors honestly owed, it can nevertheless be recovered back, together with reasonable hire, or rent for lands, as the case may be. It may be said, however, that the statute of limitations would protect the purchasers. This may be true; but it is not seen how it can change the principle, if the decisions are wrong.

Having endeavored briefly to show that there is nothing in the subject to which these decisions relate, to induce this court to adhere to them, if it shall appear upon examination that they are clearly at war with principle, I will briefly notice those of them which may be considered the leading cases on this subject, and out of which the evil has grown.

The first case to which reference will be made is that of *Wanzer* v. *Barker*, 4 How. 369. The court say in that case, that "the law allows a day in court between the giving the bond, and the time of issuing execution thereon, for an aggrieved party to be heard; when and where the facts can be spread upon the record, so as to be susceptible of review in the court of errors." They further say, that "besides the appellant was too late in moving to quash, when he suffered a term to pass." This decision, besides bearing upon its face a hasty consideration of the question, really settles nothing. It is said that "the law allows a day in court for an aggrieved party to be heard," and that this day is some day during the term to which the bond is returnable. I admit that a party has a day in court to move to quash a forthcoming bond; but what law is it that gives him this day? Is it a provision of the statute, or a rule of the common law? It is clear that the statute, if it be the law relied on by the court, while it gives by implication the party, whether plaintiff or defendant, a day in court to move to

quash a forthcoming bond, does not restrict or limit him to any day during the term to which the bond is returned, or to any other term of the court. The statute is in these words : " If a forthcoming bond be at any time quashed as faulty, the obligee or obligees in such bond, besides his or their remedy against the sheriff or other officer, may, moreover, have execution on his or their judgment, in the same manner as if such forthcoming bond had never been taken." Hutch. Code, p. 904. The words " shall at any time be quashed," are, in themselves, too comprehensive to be restricted to the term of the court to which the bond is returned. If the decision be right, then the law must read thus : " If a forthcoming bond shall be quashed at any time during the term to which it is returned," &c., the plaintiff may have execution on his judgment. The legislature must be supposed to have understood the force of the language which it employed; but be this as it may, the words of a law are never subject to construction, except when it becomes necessary to arrive at the meaning, and give effect to the intention of the legislature. Words which have an obvious meaning, which are used in the proper connection, and which, according to their ordinary import, convey the true meaning of the lawmaker, are not, under any circumstances, liable to construction by the court. To say that this provision of the law is not perfectly clear and intelligible, is to say that it is impossible for any words in the English language to make a subject so. But this subject can be more appropriately considered at another place, and in connection with another view of the question.

The next decision is that of *Field* v. *Morse & Harrod,* 1 S. & M. 348. The court in that case held, that the order of the circuit court quashing a forthcoming bond after the return term, was void. The court also quote with approbation the decision in the case of *Wanzer* v. *Barker,* and then proceed to lay down the rule in the following language : " But if the term (the return term) passes without any action on the subject, the judgment on the bond, which was previously inchoate, becomes absolute, and no further day is given. It is, then, no longer a mere bond, but a judgment on which execution may issue. If at a subsequent term the court undertakes to quash the bond,

Moody *v.* Harper.

it attempts something more, to set aside or quash a judgment. After the term at which it is rendered, the power of the court over it is at an end; the same tribunal cannot reverse or set it aside." The court quote, to sustain this view of the law, 1 Rob. Va. Practice, p. 638, in which the rule is stated as follows: " The rule at common law is, that during the term wherein any judicial act is done, the record remains in the breast of the judges of the court, and in their remembrance, and therefore the roll is alterable during that term as the judges shall direct; but when that term is past, then the record is in the roll, and admits of no alteration, averment, or proof to the contrary." Now what is necessary to bring a case within the operation of this rule? The act must, in the first place, be a judicial one, and one which remains in the breast of the judge during the term, and finally about which there is a record made by the court, and which record is unalterable at a subsequent term. But how is it in regard to a forthcoming bond? The taking of it by the sheriff, and its return into the clerk's office, are not judicial, but ministerial acts, performed in the execution of the process issued to enforce the judgment of the court. Nor is the bond, as has been decided time and again, either matter of record, or part of the record of the cause. It can only become part of the record, by a bill of exceptions taken to some ruling of the court in regard to the bond. The rule, then, may be stated in few words thus: that where the judgment of the court is final, it cannot be set aside by the same court at a subsequent term, for the reason that the judge is not allowed to trust to his memory, and undo or annul that which is matter of record, and about which the law required the court to make, or cause to be made, a perfect record.

But the court is required to make no record of either a forthcoming bond or of any of the proceedings connected therewith. The court pronounces no judgment on the bond; but whatever judgment there may be, arises from the operation of the law upon the acts of the parties to the bond, and the acts of the officer in taking and returning it into the clerk's office. The law does not operate without facts to operate upon; and hence if the facts do not exist in a particular case, or are not shown

to exist in the manner required by law, it certainly could not be said that the law had pronounced a judgment in such a case. Such a proposition would be too absurd to require notice. It would be equivalent to saying, that nothing could produce something, or that such was the peculiar magic with which the law acted, that it could in and of itself, without the existence of a single fact, produce a judgment.

To illustrate the question then: — Suppose an instrument should be returned by the sheriff, as a forthcoming bond, and suppose the clerk should say, that according to his understanding of the law as applied to the facts as shown by the bond and sheriff's return, that it had the force and effect of a judgment, and should thereupon issue an execution against all the obligors to the bond, when it was manifest that it could not have the force and effect of a judgment under the law ; must it be held in such case that because the injured party omitted at the return to move to quash the bond, that a motion could not be entertained at a subsequent term? The authorities cited, we are told, hold that the court could take no jurisdiction of the motion ; that the party was in default in not moving to quash the bond at the return term. (If such a proposition had never been entertained by judges whose opinions from their learning, ability, and integrity, are entitled to the very highest respect and consideration, it certainly would not be considered in itself of sufficient importance even to be noticed on the present occasion.) How can a party be in default when the law, and not a court in its application of the law, must pronounce the only judgment which can be prenounced in the premises ; and when the facts upon which the law must act in the particular case do not exist? A party does not move at the return term to quash a bond, because as the law must pronounce the only judgment, which can be pronounced in the matter, and as the law can only operate upon facts, and seeing that the facts do not exist, he knows that no judgment can be pronounced, or in other words, that the law will have no operation in the particular case. But suppose the clerk should be of a different opinion, and should issue an execution on the bond, and the question is brought before the court. To determine whether there is a

Moody *v.* Harper.

judgment or no judgment to uphold the execution; and the court should say that it is true, this instrument is void as a forthcoming bond; that it does not contain the facts necessary to give it the force and effect of a judgment; but that the court could entertain no jurisdiction at that term over the question, and that it was exclusively a matter between the injured party and the clerk who was, at that stage of the proceedings, the true and only exponent of the law. Such a decision would, of course, be treated as grossly absurd; but it is, nevertheless, difficult to take it out of the operation of the decisions quoted. It is true that the court could, perhaps, quash the execution on the bond, but if it could do no more, could not strike at the root of the evil, and determine the question of judgment or no judgment, so as to bind the parties, what would there be to hinder the clerk from issuing another execution on the bond, thus unnecessarily harassing one of the parties, and unjustly delaying the other in getting justice; for it must be admitted, if the court could take no jurisdiction of the question further than merely to quash the execution, and could decide nothing as to the validity of the bond, the clerk would be left free to exercise his own judgment, and might proceed to issue execution from term to term for half a century, and the court quashing it at each term, all the time regretting its want of power to strike at the root of the evil, and abate that which is the only obstacle in the way of a speedy administration of justice. It may be said that this is putting an extreme case. Admit it. It is by extreme cases that we test the correctness of principles. The decisions amount to this, that the court can determine at the return term whether a bond intended as a forthcoming bond shall have the force and effect of a judgment or not, and that it cannot so determine at any subsequent term; and if the law makes it the duty of the clerk to issue the execution in such case, it must follow as a necessary consequence, that he is the only officer who can decide the question whether there is such a judgment by operation of law as will uphold the execution.

But without noticing further these decisions, I will proceed to present my own views of the question aside from authority.

The law permitting a defendant to give a forthcoming bond,

was intended mainly for his benefit, to enable him to retain the possession and enjoyment of his property after the levy of an execution issued to enforce the judgment of the court, until the day appointed by the sheriff for the sale of the property.

The day of sale having arrived, the bond, so far as the law intended it to confer a benefit on the defendant, has performed its office. It exists, thereafter, only for the benefit of the plaintiff, and it is to give him the full measure of this benefit, without additional expense, and with as little delay as possible, that the law declares that the bond shall have the force and effect of a judgment. But for what purpose is it, that the law gives to the bond this effect? The answer is, only to make it more efficient, as part of the means by which the judgment of the court is to be enforced; for this is the judgment which put an end to the controversy between the parties, to enforce which the execution had issued, had been levied upon the defendant's property, and to regain the possession of which he executed the bond.

This is the judgment which the plaintiff is entitled to collect, and which the defendant is bound to pay. The power of the court over it, to set it aside or to annul it, may have ceased; but its power to enforce it, and to make it available to the plaintiff continues, until it shall be in fact either satisfied or barred by the statute of limitations. Justice having been ascertained, the rights of the parties settled by the judgment, the law favors the process which shall be issued to give to the injured party that which has been awarded to him by the court; and hence the court can at any time exercise such control over the process as may be necessary to make it efficient in accomplishing the desired end, namely, in executing the judgment. Or, on the other hand, if the process be such as the plaintiff has no right under the law to employ, the court may, at the instance of a defendant, prevent the abuse of it, and accordingly quash or set it aside. The taking of the bond and its return into court, are but acts done in the execution of the judgment pronounced by the court, and the court can exercise such jurisdiction over the bond as it can over any other act done by its officers of a ministerial character under its process. It is, how-

Moody *v.* Harper.

ever, said that the court may exercise this jurisdiction, but that there is a certain time within which it must be exercised. To this it is only necessary to reply, that the mere taking of a defective bond works no injury to the party, but that the act only becomes an injury when an improper use is attempted to be made of it, and the party is in time, when he shows himself ready to resist the injury about to be inflicted on him. For instance, a bond may be so defective, that the plaintiff by an execution on it could not collect half the amount of his judgment; or, again, it might bind the defendant to pay twice the amount of the judgment. Would the plaintiff be bound in such case to take only what the execution on the bond would give him, or the defendant bound to pay more than the judgment required him to pay? Clearly not. The court would instantly decide that the plaintiff was entitled to the amount of his debt, and that the act of the officer done in the execution of the process, namely, the taking of the bond, not being such an act as would result in an enforcement of the judgment of the court, that it should not bind the plaintiff, and further, as such a bond could not aid in the execution of the judgment, but would only serve to embarrass or mislead the officers under the control of the court, in their efforts to perform their duty in this respect, the bond would be quashed. The same might be said in behalf of the defendant, if it appeared that the bond bound him to do more than the law required, or bound him in a manner not required or permitted by law. The court in quashing a forthcoming bond, decides nothing as to its validity, as a common law obligation, but only that it is not such an instrument as can have the force and effect of a judgment under the statute, and not being such an instrument, the plaintiff shall not be allowed to employ it as part of the means for enforcing his judgment in that summary manner, neither shall he be compelled at the instance of the defendant so to employ it, but may at any time invoke the judgment of the court upon the bond, as he would have a right to do in regard to any other act connected with, or arising out of the process to enforce the judgment, or its execution, or attempted execution by the proper officer. The jurisdiction of the court in such case is such as it may and ought to

exercise in having its own judgment properly enforced.   The jurisdiction acquired to pronounce the judgment is one thing, and the jurisdiction to enforce it another.   The latter may be said to be but a consequence or incident of the former.  One is a jurisdiction exercised to ascertain what justice is in a particular case, and the other to see that it is fully administered to the extent that it has been ascertained.

. The jurisdiction is as complete in the one case as it is in the other.   The court had complete jurisdiction over the subject till it ascertained what justice was between the parties, and until it had made a complete record in the case.   Having ascertained justice, let it be admitted that its jurisdiction for that purpose is at an end; but would not the whole proceeding be unavailing if the court could only ascertain and declare what justice was, but was powerless when it undertook to enforce it? The court, then, having as ample jurisdiction over all questions connected with the execution of the judgment, as it had to pronounce it in the first instance, under what head must we look for the jurisdiction which it exercises in quashing a forthcoming bond?   The answer is, under that head which pertains to the execution and enforcement of its judgment.   If the bond be quashed on the motion of the defendant, it amounts simply to this: that while the plaintiff is entitled to have his judgment enforced, he must, nevertheless, proceed to do so according to certain rules of law; and there having been a deviation from those rules in the execution of the process and the taking of the bond and returning it into court, the defendant shall not be bound by these several acts, and that the plaintiff shall not, therefore, be allowed to use the bond as part of the means for enforcing his judgment.   If, on the contrary, the bond be quashed on the motion of the plaintiff, it amounts merely to a declaration, that either the process or the action of the officer under it, or both, are not such as will give the plaintiff the full benefit of his judgment, or carry into effect the sentence of the court; for it must be all the time borne in mind that it is the judgment of the court which is to be enforced, and that every act done, from the issuing of the first execution to the receipt on the sheriff's docket, looks to the accomplishment of this end;

and that it is wholly immaterial through the various stages of the proceedings, whether the means employed for this purpose shall be called executions or forthcoming bonds, they all look to the accomplishment of but the one end, the enforcement of the judgment of the court.

But let us glance at the facts of this case, and see whether the judgment quashing the bonds cannot, under any view which can be taken of the question, be sustained. It will be seen from the transcripts that the bonds were quashed by the court, on the motion of the defendant, John Shields. Admitting that. no sufficient ground for quashing existed, does it lie in the mouth of the party at whose instance the judgment was pronounced, to question its validity? The plaintiff may have been greatly injured thereby, and may have had just cause to complain; but he elects not to complain, but to submit to the judgment, and to sue out executions upon his original judgments and to proceed to enforce them, as the defendant, by his motion to quash, insisted the plaintiff ought to do. It is not to be supposed that the same court which quashed the bonds, would, while its own order stood unreversed, sustain executions on the bonds. Could the defendant, in such case, be allowed to say to the plaintiff, that " you must appeal or prosecute your writ of error, and have this order, which is irregular and which is as to you a great wrong, reversed before you shall proceed further with the execution of your judgments?" Would it not be sufficient, in such a case, for the plaintiff to reply, " that you can neither take advantage of your own wrong, nor complain of that which can only operate for your benefit?" " I, the party injured by your judgment quashing the bonds, and thus depriving me of my additional security, and delaying me in getting justice, elect not to complain of your illegal acts, but to submit to the judgment." But for these unfortunate decisions, could a doubt exist as to the judgment which reason and the plainest dictates of common sense would pronounce in such a case?

It is, however, said that consent cannot confer jurisdiction on a court where it has none, nor can acquiescence in a judgment which the court had no power to pronounce, render it valid. I do not controvert either of these positions as general

rules, but I wholly deny their application to the present case. A court always has jurisdiction to enforce a judgment which it had jurisdiction to pronounce in the first instance. It not only has jurisdiction to enforce its judgment, but to prevent the use of illegal or improper means for this purpose. When, there-fore, it quashed the bonds in this instance, it was merely exer-cising its jurisdiction in preventing the employment of improper means to enforce its judgments. Its action may have been irregular, and may have been voidable at the option of the in-jured party, but it was valid as to all others. The injured party elected not to complain, but to abandon all the rights and ad-vantages which the bonds gave him.

Besides being perfectly clear upon principle, there is direct authority on this point. " It must be admitted," say the court, in the case of *Brown* v. *Crow's Heirs*, " as a general principle, that consent cannot give jurisdiction; but this principle only applies to original jurisdiction ; or in other words, where the court never had, by law, jurisdiction in the case. But where the court once had jurisdiction, although the power may have been executed, so that without the consent of parties, the court could not change their former judgment or decree, the jurisdic-tion may be, and in many cases has been, restored by consent. In such case the maxim, " consent takes away error," applies. Hardin, R. 448; to the same point, 2 Wash. R. 213.

Acquiescence in a judgment is the same as consent previously given.

Now suppose that Shields, the party on whose motion the bonds were quashed, were now before the court contesting the validity of Moody's title acquired by virtue of the sale of the lots under executions, issued upon the original judgments. Would he be heard for a moment to make these objections, and to say that the sale was void, that he was only trifling with the court when he made his motion to quash the bonds ? Would not the answer be, that the executions on the original judg-ments were exactly such process as his own conduct had made appropriate to the case? If he should say that these judg-ments had been satisfied by the taking and forfeiture of the bonds, would it not be a good answer to say that he himself

Murphy *v.* The State.

had caused this satisfaction to be cancelled, by having that which operated as a satisfaction, set aside and annulled? And further, a satisfaction by operation of law, is no more binding on the party than a satisfaction in fact would be; and if he could voluntarily cancel the latter, why could he not consent to have the former cancelled? The only reason why an execution cannot issue on the judgment after the forfeiture of the bond, is that the judgment is treated as satisfied. If the defendant choose to cancel this satisfaction, the right to issue an execution follows as a necessary consequence, as a plaintiff may pursue his remedy to enforce his judgment until legally satisfied.

But how is the case on the facts? Shields is not the party complaining of the illegal judgment or illegal sale. He submitted, as did the plaintiff in the judgments, to the whole proceedings, and suffered his property to be sold under the executions on the judgments, without uttering a word of complaint. He has never questioned the validity of the judgments, the executions, or the sale under them. The objection is made by a stranger to the record, and the question is, whether he can be allowed to say that that was not a judgment which the parties to the record treated as such and recognized as valid. This question would seem to be too plain to require an answer.

My opinion upon the whole case is, that the judgment ought to be reversed, and the cause remanded.